IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIFTH THIRD MORTGAGE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> IRA KAUFMAN, CHICAGO TITLE ) <br> INSURANCE COMPANY, TRADITIONAL ) <br> TITLE COMPANY, LLC, ELIOT HIGUEROS ) <br> d/b/a ENH SERVICES, INC., d/b/a E&H ) <br> DISTRIBUTORS, INC., and d/b/a ENH ) <br> SERVICES LLC, ZEAL MANAGEMENT, LLC, ) <br> JOHN KELLY, RAZZAK KHADER, KRK ) <br> FINANCIAL SERVICES, INC., d/b/a KRK ) <br> MORTGAGES BANCORP and d/b/a KRK ) <br> INSURANCE SOLUTIONS, THEODORE ) <br> THEODOSIADIS, 4725 S. MICHIGAN LLC, ) <br> JEFFREY TOWNSEND, ATINUKE OKOYE, ) <br> KEVIN BURNS, MICHAEL COYLE, and ) <br> DANIEL G. BERRY, ) <br> ) <br> Defendants. ) | Case No. 12 C 4693 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Fifth Third Mortgage Company has sued a number of individuals and entities for claims arising from their alleged involvement in a mortgage fraud scheme. In particular, Fifth Third asserts three breach of contract claims against Chicago Title Insurance Company (CTIC). Fifth Third has moved for summary judgment on counts 1 and 2 of its second amended complaint, in which it asserts breach of contract claims against CTIC regarding two particular mortgage loans. In those claims, Fifth Third primarily contends that the closing agents failed to follow closing instructions required by Fifth Third when

they closed three particular mortgage loan transactions.  CTIC has cross-moved for summary judgment on these claims as well as on count 3 of Fifth Third's second amended complaint, which likewise involves a particular mortgage loan.  In other words, CTIC seeks summary judgment on all of the claims Fifth Third has asserted; it argues that Fifth Third cannot make out the elements of any of its breach of contract claims.  For the reasons stated below, the Court denies both parties' motions.

## Background

**1.     Introduction**

The claims at issue on the present motions for summary judgment concern three alleged straw purchases of real estate, which the Court will refer to as the Daugherty, Taylor, and Cook transactions.  A straw buyer scheme, as allegedly carried out in this case, involves a real estate seller or developer who recruits fake buyers to purchase residential property at an inflated price.  The buyers obtain loans, typically based on false pretenses about their finances, about whether they will occupy the property, or both.  The developer gets an inflated price for the property, and the purchasers generally are paid some amount out of the sale proceeds.  The purchasers then default on their loans, leaving the lender—or whoever the lender sold the loans to—holding the bag.

**2.     The participants and the agreements at issue**

In each transaction at issue in this case, Fifth Third loaned money to a person purporting to be a condominium purchaser to enable that person to purchase the property.  Fifth Third sold the loans to the Federal Home Loan Mortgage Corporation )Freddie Mac) or the Federal National Mortgage (Fannie Mae).  Later, after determining

that that they had been obtained fraudulently, Freddie Mac and Fannie Mae demanded that Fifth Third repurchase the loans.

CTIC issued title insurance in connection with each of the transactions through an "issuing agent"—Traditional Title Company on two of the transactions, and Primary Title Company on the other one. CTIC also issued "closing protection letters" addressed to Fifth Third covering the transactions at issue. In the closing protection letters, CTIC took on additional obligations beyond the terms of its title insurance policies. *See, e.g., FDIC v. Prop. Transfer Servs., Inc.*, No. 12-80533-CV, 2013 WL 5535561, at *10 (S.D. Fla. Oct. 7, 2013) ("[T]itle insurance policies and CPLs cover entirely different categories of losses."); *Fifth Third Mortg.-MI, LLC v. First Am. Title Ins. Co.*, No. 318037, 2015 WL 106931, at *2 (Mich. App. Mar. 10, 2015) ("A closing protection letter . . . is an indemnification agreement that provides protection for risks other than that provided under a title insurance policy."). The closing protection letters contemplated that a closing agent acting on CTIC's behalf (again, Traditional Title or Primary Title) would conduct the closing of the particular real estate transaction. The letters stated that CTIC would reimburse Fifth Third for certain actual losses that arose from the failure of the closing agent to comply with Fifth Third's written closing instructions or from the closing agent's fraud.

Specifically, the closing protection letter for each of the transactions at issue stated that CTIC would become liable to Fifth Third

> for actual loss incurred by [Fifth Third] . . . when such loss arises out of:
>
> 1.      Failure of the Issuing Agent or Approved Attorney to comply with [the Lender's] written closing instructions to the extent that they relate to (a) the status of the title to said interests in land or the validity, enforceability and priority of the lien of said mortgage on said interest in

> land, including the obtaining of such title documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by [the Lender] but not to the extent that said Instructions require a determination of the validity, enforceability, or effectiveness of such other document, or c) the collection and payment of funds due you, or;
>
> 2.   Fraud of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings to the extent such fraud affects the status of the title to said interest in land, or the validity, enforceability or priority of the lien of said mortgage on said interest in land.

See, e.g., Pl.'s Ex. 1 (Jamison Affid.), Ex. D. In a previous ruling in this case, Judge Zagel, to whom the case was then assigned, concluded that if compliance with the closing instructions would have caused Fifth Third not to make a particular loan, resulting losses would fall within the scope of the closing protection letter's trigger of liability in paragraph 1(c) for noncompliance relating to "the collection and payment of funds" due to Fifth Third. *Fifth Third Mortg. Co. v. Kaufman*, No. 12 C 4693, 2013 WL 474506, at *3 (N.D. Ill. Feb. 7, 2013). This Court agrees.

The loans were closed by personnel employed by the closing agents, Traditional Title or Primary Title. As stated in the closing protection letter, the closing agents were bound by closing instructions issued by Fifth Third. These instructions stated, in each instance, that the purchase was "an owner occupied purchase," and they also stated that "[t]he following measures must be taken to ensure the integrity of the closing":

> Establish the identity of all parties executing closing documents . . . .
>
> . . .
>
> Notify the Lender immediately of any material fact that might influence [its] decision to make this loan.
>
> Notify the Lender immediately of any discovery that a party to the transaction has made a misrepresentation.

4

> Suspend the transaction and immediately notify the Lender if the loan is owner occupied and the closing agent has knowledge that the borrower does not intend to occupy the property. Written authorization to proceed must be obtained from the Lender after such discovery.
>
> . . .
>
> Suspend the transaction and immediately notify the Lender if the closing agent has knowledge of any relationship between the parties to the transaction or if any of the service providers have previously or currently have any ownership in the subject property.
>
> Verify that the seller is vested in title and is the same person as on the closing documents, the vesting section of the title commitment binder, the purchase contract, and the appraisal . . . .

*See, e.g.,* Pl.'s Ex. 1 (Jamison Affid.), Ex. C at 3.

Fifth Third contends that the closing agents had knowledge that the purchasers of the each of the condominium units were falsely representing that the unit would be owner-occupied and that the transactions at issue were generally fraudulent. The parties dispute whether Fifth Third can establish that the closing agents failed to comply with the closing instructions.

### 3. The Daugherty transaction

Kristin Daugherty testified that she met Eliot Higueros while working as a bartender at a Chicago establishment called Red No. 5. Higueros allegedly approached Daugherty and asked her to join his investment group. Daugherty testified that Higueros told her he needed to "borrow her credit" to increase the number of properties held by the investment group. He explained that she would purchase particular properties in her name but that he would make the payments and eventually resell the property. Daugherty testified that she agreed in an effort to improve her credit rating and because she believed Higueros to be truthful. At his direction, she purchased a

total of eight units at 4725 S. Michigan Avenue in Chicago over a five-week period between April 30, 2007 and June 5, 2007. To finance purchase, Daugherty obtained a loan by submitting an application that contained false information concerning her income, profession, and intent to occupy the property. In particular, each of the eight loan applications said that Daugherty was purchasing the particular property as her primary residence. Daugherty testified that she never read the applications.

Michael Lee, a closer at Traditional Title, closed each of the Daugherty transactions and several other purchases of units at 4725 S. Michigan. Of the eight units Daugherty purchased, Fifth Third financed only one—Unit 1F, Daugherty's fourth purchase, which was closed on May 7, 2007. Lee testified that his duties as a closer required him to check the borrowers' personal identification and ensure that the documents in the loan package were properly signed. Lee further testified that although he did not know the true nature of the scheme, he developed a suspicion that the 4725 S. Michigan transactions were fraudulent, based at least in part on the number of purchases Daugherty was making. Lee also testified that Kaufman, an attorney and one-third owner of Traditional Title, oversaw every closing in which he was listed as the seller's attorney, see Pl.'s Ex. 30 (Lee Dep.) at 12, which includes all of the Daugherty purchases. Lee said that he raised his concern about Daugherty's multiple purchases with Kaufman, because he thought it was a "red flag." Kaufman explained the situation by saying that Daugherty was "an investor."

Lee testified that he tendered his resignation on March 21, 2007 after becoming suspicious of the 4725 S. Michigan transactions but that he continued handling closings for one week after resigning. When presented with the fact that he closed a purchase

6

on April 30, 2007, however, Lee changed his testimony and said that he must have stayed on for a month rather than a week. But he closed the sale of Unit 1F to Daugherty—the sale in question—on May 7, 2007, more than forty-five days after he said he had become concerned about the possibility of fraud. A reasonable fact finder could conclude from this that at the time of the Daugherty transaction, Lee was aware of material facts that might influence the making of the loan and also that Daugherty did not actually intend to occupy the property.

**4.     The Taylor transaction**

Upon Lee's departure from Traditional, Julio Martinez began handling closings of sales of properties at 4725 S. Michigan. Between June 7, 2007 and October 10, 2007, Martinez closed nine purchases of units at the 4725 building—five of them for a single buyer, Amanda Fanaro, over a period of just thirty-one days, each of the five supposedly to be her primary residence. Martinez testified that he saw this as a red flag and that he concluded that Fanaro was a straw buyer. Martinez also handled other closings on units at the 4725 building where particular buyers purchased multiple units, each supposedly as the buyer's primary residence. Martinez further stated that the owners of the project "were known to do shady business."

On October 29, 2007, alleged straw buyer Pamela Taylor closed on Unit 4C at 4725 S. Michigan—the last of the building's twenty-seven units to be sold. The parties dispute who closed this transaction. The loan application includes Melissa Clark's signature and notary seal, but Clark denies closing the sale. Clark testified that Martinez stole her notary stamp and that he closed this sale. Martinez testified that he never used anyone else's stamp but added that if he did use someone else's stamp, he

7

had that person's consent.[1]

5.  **The Cook transaction**

On November 13, 2007, William Cook purchased a condominium at 6621 S. Ingleside. He purchased another on January 25, 2008. In both transactions, Cook represented that the particular property would be his primary residence. Both transactions were closed by Primary Title. Fifth Third financed the second purchase. The closer on that transaction testified that she knew Cook had previously purchased a unit but said she did not know that either unit was designated as a primary residence. (The loan applications and closing instructions both made this representation, however, and as noted earlier the closing instructions called the closing agent's attention to the significance of this statement.) During his deposition, Cook asserted his Fifth Amendment privilege on nearly every question.

6.  **Freddie Mac and Fannie Mae**

The properties involved in the Daugherty and Taylor transactions were foreclosed in 2009. In 2009-10, Freddie Mac demanded that Fifth Third repurchase both of these loans once it became aware that they did not meet its standards and had been purchased fraudulently. Fifth Third says that it paid Freddie Mac $126,748 on the Daugherty transaction and that it received net proceeds of $1,852 from the later resale of the property. Fifth Third says that it paid Freddie Mac $182,610 on the Taylor transaction and later received net proceeds of $1,894 from the property's resale.

The property involved in the Cook transaction defaulted in June 2009. Fannie

---

[1] In its complaint, Fifth Third alleged that Taylor purchased multiple units at 6621-23 S. Ingleside, another property allegedly associated with the overall scheme, that were closed by the same closing agent. However, Fifth Third has not pursued this in its present motion as a basis for entry of summary judgment.

Mae likewise demanded that Fifth Third repurchase the Cook loan, for similar reasons. Fifth Third paid Fannie Mae $290,815 on this transaction.

## Discussion

Fifth Third has moved for summary judgment on its breach of contract claims against CTIC on the Daugherty and Taylor transactions. It contends, among other things, that Traditional Title was aware these transactions were fraudulent and nonetheless allowed the closings to proceed and made no disclosure to Fifth Third of what it knew. CTIC has cross-moved for summary judgment, arguing that Fifth Third cannot establish the elements of a breach of contract claim with regard to the Daugherty, Taylor, and Cook transactions.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The Court views the evidence and draws reasonable inferences from it in the light most favorable to the non-movant. *See Williamson v. Ind. Univ.*, 345 F.3d 459, 462 (7th Cir. 2003). On cross-motions for summary judgment, the Court considers each motion separately and views the evidence in the light most favorable to the party against whom each motion is under consideration. *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561 (7th Cir. 2002).

To prevail on a breach of contract claim, a plaintiff must show: 1) the existence of a contract; 2) performance of all conditions to be performed by plaintiff; 3) breach by the

9

defendant; 4) damages to the plaintiff as a consequence of the breach. *Schubert v. Federal Exp. Corp.*, 306 Ill. App. 3d 1056, 1059, 715 N.E.2d 659 (1999). The parties do not dispute that a contract existed or that Fifth Third performed any conditions it was required to perform. The issues in dispute are CTIC's alleged breach, causation, and damages. The Court examines each in turn.

**1.     Breach**

The parties have spilled a good deal of ink addressing whether and the extent to which a closing agent owes a duty outside of its contractual obligations. But Fifth Third's only claims against CTIC arising from the closing agents' actions or inactions are claims for breach of contract. The Court therefore confines its consideration to the contract's terms and whether the closing agents breached them. *See* Pl.'s Reply at 11 ("The closing instruction[s] set forth what was required, Fifth Third did not impose any alleged extra-contractual duties.").

"Under Illinois law, the interpretation of a contract is a question of law that is decided by the Court." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). When interpreting a contract, "a court will first look to the language of the contract itself to determine the parties' intent." *Thompson v. Gordon*, 214 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). A contract must be construed as a whole, viewing each provision in light of the other provisions. *Id.* If the words in the contract are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *Id.*

Fifth Third contends that the closing agents (Traditional and Primary): (1) failed to comply with Fifth Third's closing instructions by not suspending the transactions and notifying Fifth Third despite having knowledge that the borrowers did not intend to

10

occupy the units being purchased; (2) along the same lines, failed to notify Fifth Third upon realizing that the ostensible purchasers had made misrepresentations; and (3) more generally, failed to notify Fifth Third of material facts, including the indicia of fraud surrounding the transactions. Fifth Third argues that these breaches affected the collection and payment of funds due to Fifth Third and thus are within the scope of the coverage provided by paragraph 1(c) of the closing protection letters, quoted earlier. Fifth Third also contends, or at least appears to contend, that the closing agents were involved in fraud in handling documents and funds in connection with the closings and that this affected the status of its title or the enforceability of the mortgages that it obtained in the transactions. This, Fifth Third contends, should result in a determination that there is coverage for its losses under paragraph 2 of the closing protection letters. *See generally Fifth Third Mortg.-MI*, 2015 WL 1069341, at *7.

The provision of the closing instructions most directly at issue for at least two of the three loans is the term that requires the closing agent to suspend the transaction and notify Fifth Third if the loan requires the property to be owner-occupied and the closing agent has knowledge that the buyer does not intend to occupy the property. The term "closing agent" is not defined in the closing instructions. The parties have not directly addressed, or at least have not adequately addressed, whether this term refers just to the particular individual conducting the closing or instead to the entity conducting the closing, that is, either Traditional Title or Primary Title. (The distinction likely does not matter in terms of whether the three claims at issue survive the summary judgment motions, but it may matter at trial.) It appears to the Court to be more likely, given the way this term is used in the closing instructions, that it refers to the entity and not just to

the individual closer: the instructions require the "closing agent" to perform certain tasks not just at the closing itself, but also before, and the term is also roughly parallel to the term "issuing agent" used in the closing protection letter, which quite clearly refers to the entity as a whole.

Another question concerns the meaning of the term knowledge. Knowledge is commonly defined as including not just actual knowledge but also willful blindness, that is, a person's awareness of a high probability that a particular fact exists and his taking of deliberate actions to avoid learning of the fact's existence. *See generally Global-Tech Appliances, S.A. v. SEB S.A.*, 563 U.S. 754, 766-59 (2011). As a matter of agency law, the knowledge of an agent is imputed to the agent's principal. *See, e.g., McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589, 909 N.E.2d 310, 331 (2009). There are exceptions, but none of them apply here. *See id.* at 589-90, 909 N.E.2d at 332. The first exception is when the agent does not have a duty to disclose, but that is not the case here. The second exception applies when the agent is acting adversely to the principal's interests, and the third applies when the agent is engaged in fraud for his own benefit. There is likewise no basis to apply either of these exceptions here. CTIC contends that an agent's knowledge is imputed to the principal only when the agent is obligated to speak to his principal about the particular type of knowledge. *See* Def.'s Combined Resp. to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ. J. at 14. Even if this were the case, it would not get CTIC off the hook. The closers were working for Traditional and Primary in carrying out closing instructions from Fifth Third that specifically required Traditional and Primary to advise Fifth Third if certain facts existed. If the very points that the closing instructions required Traditional and Primary to

disclose were outside the closers' duty to report to their principal, the closing instructions would amount to a dead letter.

Also as a matter of agency law, a principal is presumed to have the collective knowledge of all of its employees and agents. *See, e.g., Camacho v. Bowling*, 562 F. Supp. 1012, 1025 (N.D. Ill. 1983). CTIC may be able to rebut this presumption at trial, but the Court applies it for purposes of the present motions. In addition, the knowledge of even lower-level employees is imputed to the entity of which they are agents. *See, e.g., Bryant v. Livigni*, 250 Ill. App. 3d 303, 309, 619 N.E.2d 550, 556 (1993).

### a. The Daugherty transaction

On the Daugherty transaction, Fifth Third relies primarily on the testimony of loan closer Lee, who testified that he became suspicious regarding the sales of units at 4725 S. Michigan based on Daugherty's repeated purchases of units in the building. Lee also testified that Kaufman told him that Daugherty was buying properties for investment purposes, which would seem to be the antithesis of an owner-occupied purchase. The loan application for the Daugherty transaction stated that she was buying Unit 1F as her principal residence, and the closing instructions specifically required Traditional Title to, among other things, "[s]uspend the transaction and immediately notify [Fifth Third] if the loan is owner occupied and the closing agent has knowledge that the borrower does not intend to occupy the property." Pl.'s Ex. 1 (Jamison Affid.), Ex. C at 3. A reasonable fact finder could determine that Traditional Title had the requisite knowledge and yet failed to act as the closing instructions required, thus triggering liability under section 1(c) of the closing protection letter. Fifth Third offers other bases for liability—including knowledge of the fraudulent nature of purchase at the 4725 S. Michigan building

generally, as well as imputation of knowledge held by defendant Ira Kaufman, who besides being a principal of Traditional Title also is claimed to have participated in the Daugherty transaction as an attorney—but the Court need not address these at present given the sufficiency of Lee's testimony as evidence of a breach.

But although CTIC is not entitled to summary judgment on this claim, that does not mean that summary judgment should or may be entered in Fifth Third's favor. It is less than crystal clear when Kaufman told Lee that Daugherty was an investment buyer or when Lee came to the realization that something was amiss regarding Daugherty's repeated purchases—as indicated, in part, by the conflicting testimony from Lee himself regarding when he stopped closing sales for Traditional Title.

In sum, there are genuine factual disputes precluding the entry of summary judgment in either party's favor on Count 1 of Fifth Third's complaint.

### b. The Cook transaction

Fifth Third has not moved for summary judgment on its claim regarding the Cook transaction, but CTIC has. It argues that Cook's purchase did not take place under the sort of suspicious circumstances that Fifth Third contends existed on the 4725 S. Michigan transactions. Among other things, CTIC points to the fact that Cook's loan financed a purchase of property at a location other than 4725 S. Michigan. It also notes that none of the criminal defendants had any involvement in the Cook transaction.

Though Fifth Third has less direct evidence on this transaction than it does on the Daugherty transaction, that does not mean that its claim is infirm. As discussed earlier, there is evidence that not too long before Cook purchased the unit at issue in this case, saying it would be his primary residence, he purchased another unit at the

same building making the same representation.  There is also evidence from which a reasonable fact finder could determine that the closing agent, and perhaps even the individual closer, had knowledge of this fact when Cook entered into the deal at issue in this case.  If so, that would be sufficient to trigger the closing agent's obligation to suspend the closing and call the matter to Fifth Third's attention.  CTIC is not entitled to summary judgment on the issue of breach for this transaction.

      **c.**      **The Taylor transaction**

Though the identity of the closer on the Taylor transaction is disputed, the evidence would permit a reasonable fact finder to conclude that it was Martinez.  Fifth Third contends that Martinez in particular, and Traditional Title generally, knew of material facts that might influence Fifth Third's decision to make the loan, specifically that the Taylor transaction, like other purchases at the 4725 building, was fraudulent.  A reasonable fact finder could determine that Traditional and indeed Martinez itself, via participation in a series of questionable transactions involving units at the building over a relatively short period of time, had facts (including several sets of multiple purchases by particular buyers, purportedly as the buyer's principal residence) that would have enabled Fifth Third to conclude the deals were fraudulent.  Indeed, Martinez himself appears to have drawn just this conclusion.  But neither he nor Traditional Title, the contracting party, brought these facts to Fifth Third's attention.  For these reasons, CTIC is not entitled to summary judgment, and thus the Court need not address the other bases for liability argued by Fifth Third.

Fifth Third similarly is not entitled to summary judgment.  First, as the Court has indicated, there is a genuine dispute over whether Martinez closed the transaction.

15

More generally, a reasonable fact finder could determine that the matters known to him or to Traditional generally did not add up to material facts within Traditional's contractual duty to disclose, at least not as of the time of the Taylor transaction (or the others at issue in this case).

**2. Causation and damages**

In its cross motion for summary judgment, CTIC argues that Fifth Third has failed to offer evidence from which a reasonable fact finder could find the requisite causation or damages. In particular, CTIC argues that Fifth Third cannot establish that its losses arose from the alleged breaches by Traditional and Primary.

Fifth Third's main argument it is not required to prove causation or damages, because breach of contract is a form of strict liability. For this premise, Fifth Third cites *Moran Foods, Inc. v. Mid-Atlantic Market Development Co., LLC*, 476 F.3d 436, 439 (7th Cir. 2007), in which the Seventh Circuit stated that "because liability for breach of contract is a form of strict liability, a promisor is in effect a guarantor of performance even if he is unable and not merely unwilling to perform him contractual obligations." *Id.* Strict liability, however, does not excuse a plaintiff from proving causation or damages; rather it excuses a plaintiff from proving intent or negligence. That is what the Seventh Circuit essentially said in *Moran*: the defendant is on the hook irrespective of his willingness or ability to comply. The fact that contract liability is a form of strict liability does not mean that the plaintiff need not connect the breach to his injury. Indeed, the primary case cited by Fifth Third on contract liability in its opening brief says that the plaintiff on a breach of contract claim must show a breach by the defendant and "damages to plaintiff *as a consequence thereof*." *Shubert v. Fed. Express Corp.*, 306 Ill.

App. 3d 1056, 1059, 715 N.E.2d 659, 662 (1999) (emphasis added).

The closing protection letter requires Fifth Third to show that its losses "arise[ ] out of" a breach of the closing instructions. This requires, for each claim, a showing of a causal connection or relationship between the closing agent's conduct and the injury. *See Prop. Transfer Servs.*, 2013 WL 5535561, at *14. The record includes sufficient evidence that the alleged failures by the closing agents by abide by the closing instructions resulted in Fifth Third funding loans to straw buyers who defaulted. *See id.* In addition, Fifth Third's evidence is sufficient to permit a reasonable fact finder to find that the alleged breaches of the closing instructions caused it to close on loans that it would not have made absent the breaches. In particular, Fifth Third has submitted an affidavit from a bank vice president, Faye Jamison, who says that "Fifth Third ensured that its loans complied with the guidelines set forth in the [Fannie Mae] and [Freddie Mac] Seller Guides." Pl.'s Ex. 1 (Jamison Affid.) ¶ 18. Although Fifth Third did not submit the Seller Guides as an exhibit, Freddie Mac's repurchase letter for the Daugherty loan makes it clear that to be eligible for purchase by the agency, a mortgage loan has to be for an owner-occupied residence. *See id.*, Ex. E. One reasonably can infer from this that had Fifth Third been made aware that the Daugherty and Cook properties were not actually owner-occupied, it would not have closed on the loans, because they would not have been eligible for purchase by Freddie Mac or Fannie Mae. More generally, a reasonable fact finder could infer that if the closing agents had brought to Fifth Third's attention material facts indicating the transactions were fraudulent or involved straw buyers, Fifth Third would have put on the brakes and would not have made the loans. In sum, there is sufficient evidence of causation to

survive summary judgment.

CTIC also contends that Fifth Third has not offered evidence that it suffered damages resulting from the alleged breaches. Jamison's affidavits also address this point. She states that once Freddie Mac discovered that the Daugherty and Taylor loans were non-compliant and asserted a claim against Fifth Third, the bank had to pay out $126,748.70 to satisfy Freddie Mac's claim on the Daugherty loan and $182,610.23 to satisfy its claim on the Taylor loan. Jamison makes similar representations regarding the Cook loan. Her affidavits are sufficient to preclude entry of summary judgment for CTIC on this basis.

CTIC says that any losses by Fifth Third resulted from other factors; it asks the Court to take judicial notice of the economic recession that took place from 2007 through 2009 and argues that general economic conditions and other factors caused Fifth Third's losses. CTIC may be able to assert this contention at trial, but it is not a basis for entry of summary judgment in CTIC's favor. Freddie Mac and Fannie Mae did not seek indemnity from Fifth Third based on poor market conditions or vandalism; rather their claims were based on the loans' nonconformity to their guidelines for purchasing loans. CTIC is not entitled to summary judgment on this basis.

## Conclusion

For the foregoing reasons, the Court denies both parties' motions for summary judgment [dkt. nos. 381, 397]. The case is set for a status hearing on May 31, 2016 at 9:30 a.m.

                                                                      MATTHEW F. KENNELLY
                                                                      United States District Judge

Date: May 14, 2016